# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

BID PROTEST
No. 17-1250C
Filed Under Seal: February 16, 2018
Reissued for Publication: March 27, 2018[*]

|  |  |  |
|---|---|---|
| IRON BOW TECHNOLOGIES, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Pre-Award Bid Protest; Judgment Upon the Administrative Record; RCFC 52.1; Supplementing the Administrative Record; Permanent Injunction. |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| v. | ) | |
| NCS TECHNOLOGIES, INC., | ) | |
| Defendant-Intervenor. | ) | |

   *James C. Fontana, Esq.*, Counsel of Record, *James C. D'Agostino, Esq.*, *Jeffry R. Cook, Esq.*, *David B. Dempsey, Esq.*, Dempsey Fontana, PLLC, Tysons Corner, VA, for plaintiff.

   *Sheryl L. Floyd*, Senior Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Chad A. Readler*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Ellen Rothschild*, Of Counsel, *Dorothy M. Guy*, Of Counsel, *Ryan M. Warrenfeltz, Sr.*, Of Counsel, Office of General Law, Office of the General Counsel, United States Social Security Administration, Baltimore, MD, for defendant.

---

[*] This Memorandum Opinion and Order was originally filed under seal on February 16, 2018 (docket entry no. 76), pursuant to the Protective Order entered in this action on September 15, 2017 (docket entry no. 16). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the Protective Order. The parties filed a joint status report on March 9, 2018 (docket entry no. 80) indicating the redactions they contend are warranted. The government also filed a response to the joint status report, objecting to the redactions proposed by plaintiff (docket entry no. 81). On March 27, 2018, the government filed an unopposed motion for leave to file an illustration of plaintiff's proposed redactions to the February 16, 2018, Decision (docket entry no. 85). And so, the Court is reissuing its Memorandum Opinion and Order, dated February 16, 2018, with the adopted redactions indicated by three consecutive asterisks within brackets ([***]).

*Thomas K. David, Esq.*, Counsel of Record, *Katherine A. David, Esq.*, *Kenneth D. Brody, Esq.*, David, Brody & Dondershine, LLP, Reston, VA; *Andrew Shipley, Esq.*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington DC, for defendant-intervenor.

**MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.    INTRODUCTION

Plaintiff, Iron Bow Technologies, LLC ("Iron Bow"), brings this pre-award bid protest action challenging the Social Security Administration's (the "SSA") decision to eliminate Iron Bow's quotation from consideration for award of a contract for desktop printers and related supplies and services, because the proposed printers presented an unacceptable supply chain risk to the government.  Iron Bow has moved for judgment upon the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  *See generally* Pl. Mot.  In addition, Iron Bow has filed two motions to supplement the administrative record; a motion to admit its proposed expert to the Protective Order; and a motion for leave to file a reply brief in support of its motions to supplement the administrative record.  *See generally* Pl. 1st Mot. to Supp.; Pl. 2d Mot. to Supp.; Pl. Mot. to Admit; Pl. Mot. for Leave.

The government and the defendant-intervenor in this matter, NCS Technologies, Inc. ("NCS"), have also filed cross-motions for judgment upon the administrative record pursuant to RCFC 52.1.  *See generally* Def. Mot; Def.-Int. Mot.  The government has also moved to strike certain declarations filed in support of Iron Bow's motion for judgment upon the administrative record.  *See generally* Def. Resp.

For the reasons discussed below, the Court:  **DENIES** Iron Bow's motions to supplement the administrative record; **GRANTS** the government's motion to strike; **DENIES** Iron Bow's motion for judgment upon the administrative record; **GRANTS** the government's and NCS's respective cross-motions for judgment upon the administrative record; **DENIES** as moot Iron Bow's motion to admit and motion for leave to file a reply brief in support of its motions to supplement the administrative record; and **DISMISSES** the complaint.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.     Factual Background

In this pre-award bid protest matter, Iron Bow challenges the SSA's decision to eliminate its quotation from consideration for award of a contract for desktop printers and related supplies and services, in connection with Request for Quotation No. SSA-RFQ-17-1030 (the "RFQ"), because the proposed printers presented an unacceptable supply chain risk to the government. Am. Compl. at ¶ 1; *see also* AR at 1: 1.  Specifically, Iron Bow alleges that the SSA's decision to exclude its quotation from consideration for award should be set aside because the supply chain risk assessment (the "SCRA") upon which it was based is flawed and irrational.  Am Compl. at ¶¶ 2, 7; Pl. Mot. at 1-3, 10-32.  As relief, Iron Bow requests that the Court declare the SSA's SCRA to be irrational and that the Court permanently enjoin the SSA from awarding any contract under the RFQ until Iron Bow's quote is properly evaluated.  Am. Compl. at ¶ 7, Prayer for Relief; Pl. Mot. at 3, 40.  Alternatively, Iron Bow requests that the Court direct the SSA to award the disputed contract to Iron Bow.  Am. Compl. at ¶ 7; Pl. Mot. at 3.

### 1.     The RFQ

On November 22, 2016, the SSA issued the RFQ for the purpose of awarding a single blanket purchase agreement for various printers and associated equipment, support services, and supplies.  AR at 1: 1; 24: 4015.  Under the terms of the RFQ, the SSA "intends to purchase monochrome and color desktop printers; monochrome and color multi-function printers; monochrome and color network printers; and associated equipment, support services, and supplies," to replace the existing printers housed at the agency's offices located throughout the United States and internationally.  *Id.* at 24: 4015; *see also id.* at 1: 1.

Specifically relevant to this dispute, section E.5, phase 5 of the RFQ requires that the SSA conduct a supply chain risk assessment of the apparent contract awardee—including an assessment of any subcontractors, suppliers, distributors, and manufacturers involved in the

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR"); plaintiff's amended complaint ("Am. Compl."); plaintiff's motion for judgement upon the administrative record ("Pl. Mot."); and the government's opposition and cross-motion for judgment upon the administrative record ("Def. Mot.").  Except where otherwise noted, all facts recited herein are undisputed.

awardee's supply chain.  Am. Compl. at ¶ 12; AR at 3: 266-67, 24: 4016.  In this regard, section E.5 provides that the SSA will evaluate the information provided to it by the apparent awardee— along with any other information available to the SSA from any other source—"to assess the supply chain risk associated with the apparent awardee's quotation, to determine if the quotation presents an unacceptable risk to SSA."  AR at 3: 266-67.

Section E.5 of the RFQ sets forth nine specific factors that the SSA may consider in conducting the SCRA.  *Id.*  These factors focus upon, among other things:  (1) the foreign ownership or control of the apparent awardee, or its subcontractors or suppliers; (2) the degree to which the apparent awardee and its subcontractors or suppliers maintain formal security programs, that include personnel, information, physical, cyber security, and supply chain risk management programs; and (3) the locations of the manufacturing facilities where the hardware and software are designed, manufactured, packaged, and stored prior to distribution.  *Id.* at 3: 266.  The RFQ further provides that some of the other factors that the SSA may consider in conducting the SCRA include:  (1) the means and methods by which the hardware and software would be delivered under the contract; (2) whether the proposed information system, hardware, or software includes a service agreement required by the contract; and (3) the identity of the entity to provide disposal service of any information system, hardware, or software required under the contract.  *Id.* at 3: 266-67.

Lastly, the RFQ provides that, "[s]hould the apparent awardee's supply chain risk assessment pose no or an acceptable amount of risk to the government, SSA shall make award to that contractor."  *Id.* at 3: 267.  If the SSA's SCRA finds unacceptable risk to the government, the RFQ requires that the SSA not award the contract to the apparent awardee and conduct a new supply chain risk assessment for the next lowest-priced quotation.  *Id.*

### 2.   Iron Bow's Quotation And The SCRA

Iron Bow timely submitted its quotation in response to the RFQ on January 11, 2017.  *Id.* at 16: 1921 n.1; *see also id.* at 6: 497-500, 11: 512-24; Am. Compl. at ¶ 14.  Iron Bow's quotation proposed, among other things, that the printers to be provided to the SSA be manufactured by Lexmark International, Inc. ("Lexmark")—a Chinese company.  AR at 11: 512-24.

In a letter dated March 15, 2017, the SSA informed Iron Bow that its quotation was the apparent awardee for the contract and the agency requested that Iron Bow submit information concerning the SCRA. *Id.* at 6: 497-500, 24: 4016; *see also* Am. Compl. at ¶ 15. Iron Bow timely submitted responses to the SSA's information request on March 30, 2017. AR at 11: 512-25; *see also* Am. Compl. at ¶ 15.

Thereafter, the SSA's Office of Information Security conducted a supply chain risk assessment of Iron Bow's quotation. AR at 24: 4016. During the SCRA, the SSA learned, among other things, that Lexmark is owned by three Chinese investment firms: Apex Technologies Co. Ltd. (51% ownership), PAG Asia Capital (43% ownership), and Legend Holdings (6% ownership). *Id.* at 12: 528, 549, 552. The SSA also learned that two of these foreign firms could be connected to the Chinese government. *Id.* at 12: 528, 535-38.

In this regard, the SSA reviewed a Bloomberg Company Overview of Lexmark, which indicated that PAG Asia Capital's managing partner, [***], is a former senior official in China's Ministry of Trade and Economic Cooperation. *Id.* at 12: 535, 742, 744. The SSA also reviewed the corporate website for Legend Holdings, which showed that the Chinese Academy of Sciences is an investor in Legend Holdings. *Id.* at 12: 535, 746-49. In addition, the SSA reviewed several congressional reports that indicated that the Chinese government has been engaged in espionage activities aimed at the theft of sensitive information from United States corporations and the United States Government. *Id.* at 12: 536-37, 1864-70.

In light of this information, the SSA concluded that Iron Bow's reliance upon Lexmark as its primary supplier of printer equipment presented an unacceptable security risk. *Id.* at 12: 536-38. And so, the SSA's contracting officer eliminated Iron Bow from award consideration due to an unacceptable supply chain risk to the government. *Id.* at 13: 1915, 14: 1916-17, 24: 4016-17; *see also* Am. Compl. at ¶ 16.

### 3.    Iron Bow's GAO Protest

On July 21, 2017, Iron Bow timely filed a protest before the Government Accountability Office (the "GAO") challenging the SSA's decision to eliminate its quotation from further consideration for award under the RFQ. AR at 16: 1920-35, 24: 4017; *see also* Am. Compl. at ¶ 31. The GAO subsequently dismissed Iron Bow's protest. AR at 22: 3679-80, 24: 4017; *see also* Am. Compl. at ¶ 32; *Iron Bow Technologies, LLC*, B-414963 (Comp. Gen. Sept. 12, 2017).

4.      The Supplemental SCRA And The
        Contracting Officer's Remand Decision

After Iron Bow commenced this action on September 13, 2017, the Court stayed and remanded this matter to the SSA to:  (1) consider Lexmark's Committee on Foreign Investment in the United States ("CFIUS") National Security Agreement (the "NSA") and related attachments, in light of the RFQ's SCRA provisions; and, if warranted, (2) reconsider the agency's recommendation that Iron Bow's proposed printers pose an unacceptable supply chain risk to the government.  Order, dated Oct. 5, 2017; *see also* AR at 23: 3681-4012.  At the conclusion of the remand proceedings, the SSA issued a supplemental SCRA based upon the information contained in the NSA and other information that the agency reviewed.  AR at 23: 3681-4012.

In the supplemental SCRA, the SSA concluded that, among other things:  (1) the CFIUS process did not preclude the SSA from independently assessing the risk that a potential contract poses to the agency; (2) the mere existence of a national security agreement did not imply that CFIUS determined that there is no risk to federal agencies in doing business with an entity that has entered into such a NSA; and (3) the SSA was entitled to make its own risk determination as to whether contracting with Iron Bow—with Lexmark as a supplier—posed an unacceptable security risk to the government  *Id.* at 23: 3681-94.

The SSA also determined that, based upon a review of Lexmark's NSA, the Chinese government's interest in Lexmark was greater than the SSA initially recognized.  *Id.* at 23: 3691-93.  Specifically, the SSA found that Legend Holdings also holds an ownership interest in Apex Technologies Co. Ltd., Lexmark's majority owner.  *Id.* at 23: 3692-93.

The SSA also found that another company which acts on behalf of the Chinese Academy of Sciences—CAS Holdings—owns 29 percent of Legend Holdings.  *Id.* 23: 3692-93, 3984-93.  And so, the SSA determined that purchasing printers manufactured by Lexmark would pose an unacceptable supply chain risk to the government.[2]  *Id.* at 23: 3694.  In addition, the SSA found

---

[2] The SSA also found that the purpose and authorities of the Committee on Foreign Investment in the United States are narrowly focused on the review of foreign acquisition of United States businesses to determine risk to national security and mitigating those risks.  AR at 23: 3682-83.  And so, the SSA determined that this purpose was different from the purpose of the SSA's supply chain risk assessment.  *Id.* at 23: 3683.  The SSA also concluded that Lexmark's National Security Agreement was not intended

that certain new Chinese national security and cybersecurity laws would increase the risk to the government of purchasing equipment from Chinese-owned companies. *Id.* at 23: 3681-94

On December 21, 2017, the SSA's contracting officer issued a decision that adopted the recommendations contained in the supplemental SCRA and concluded that awarding a blanket purchase agreement to Iron Bow for the purchase of Lexmark printers and supplies would present an unacceptable supply chain risk to the government. *Id.* at 24: 4020.

### B.   Procedural History

Iron Bow commenced this post-award bid protest matter on September 13, 2017. *See generally* Compl.[3]  On September 13, 2017, Iron Bow filed motions for a preliminary injunction and for a temporary restraining order, as well as a memorandum in support thereof, pursuant to RCFC 65. *See generally* Pl. PI/TRO Mot.; Pl. PI/TRO Mem.  On that date, plaintiff also filed a motion for entry of a protective order. *See generally* Pl. Mot. for Prot. Order.  The Court granted plaintiff's motion and entered a Protective Order on September 15, 2017. *See generally* Prot. Order, dated Sept. 15, 2017.

On October 5, 2017, the Court stayed further proceedings and remanded this matter to the SSA for the purpose of allowing the SSA to:  (1) review Lexmark's NSA and related attachments in light of the RFQ's SCRA provisions; and if warranted, (2) reconsider its recommendation that the proposed printers would pose an unacceptable supply chain risk to the government in light of the NSA and related attachments, pursuant to RCFC 52.2. *See generally* Order, dated Oct. 5, 2017; *see also* Def. Mot. to Stay.

On December 21, 2017, the government filed the SSA's remand decision. *See generally* Def. Status Rep., dated Dec. 21, 2017, Ex. 1 at 1-8.  On January 5, 2018, Iron Bow filed a notice of its intent to proceed in this matter and a request for an expedited hearing on its motions for a temporary restraining order and for a preliminary injunction. *See generally* Pl. Notice.

On January 8, 2018, Iron Bow filed a supplemental brief in support of its motions for a temporary restraining order and for a preliminary injunction. *See generally* Pl. Supp. Br.  During

---

to mitigate supply chain risks that can be mitigated through the SSA's procurement authorities. *Id.* at 23: 3684-91.

[3] On January 12, 2018, Iron Bow filed an amended complaint. *See generally* Am. Compl.

a telephonic status conference held on January 10, 2018, the Court granted Iron Bow's motion for a temporary restraining order and issued a temporary restraining order enjoining the SSA from awarding the contract at issue until January 24, 2018. *See generally* TRO, dated Jan. 10, 2018.

On January 16, 2018, the government filed the administrative record. *See generally* AR. On that same date, Iron Bow filed a motion to admit its proposed expert to the Protective Order. *See generally* Pl. Mot. to Admit.

On January 17, 2018, Iron Bow filed a motion to supplement the administrative record. *See generally* Pl. 1st Mot. to Supp.  On January 18, 2018, Iron Bow filed a motion for judgment upon the administrative record and a motion for a permanent injunction. *See generally* Pl. Mot. On January 19, 2018, Iron Bow filed a second motion to supplement the administrative record. *See generally* Pl. 2d. Mot. to Supp.

On January 22, 2018, the government and NCS filed their respective cross-motions for judgment upon the administrative record and responses and oppositions to Iron Bow's motion for judgment upon the administrative record and motion for a permanent injunction. *See generally* Def. Mot.; Def.-Int. Mot.  On that same date, the government filed an opposition to Iron Bow's motions to supplement the administrative record and a motion to strike. *See generally* Def. Resp.

On January 23, 2018, Iron Bow filed a reply brief in support of its motion for judgment upon the administrative record and motion for a permanent injunction and a motion for leave to file a reply brief in support of its motions to supplement the administrative record. *See generally* Pl. Reply; Pl. Mot. for Leave.  On January 24, 2018, the government filed a reply brief in support of its cross-motion for judgment upon the administrative record. *See generally* Def. Reply.

The Court held oral argument on the parties' pending motions on January 24, 2018.  At the conclusion of the oral argument, the Court issued an oral decision denying Iron Bow's motions to supplement the administrative record; granting the government's motion to strike; granting the government's and NCS's respective cross-motions for judgment upon the administrative record; denying Iron Bow's motion for judgment upon the administrative record; denying Iron Bow's motion for a permanent injunction; and dismissing the complaint.  Tr. of Oral Arg. at 83:6-16.

### III.   LEGAL STANDARDS

### A.   Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This Court reviews agency actions in bid protest matters under the "arbitrary and capricious" standard under the Administrative Procedure Act (the "APA"). *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the APA). Under this standard, an award may be set aside if: "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

In this regard, the United States Court of Appeals for the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id*. (internal citations omitted).

In reviewing an agency's procurement decision, the Court also recognizes that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted). In addition, the Court should not substitute its judgment for that of the agency. *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, to prevail in a bid protest matter "'[t]he protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law.'" *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003)

(quoting *Info., Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003)).

This standard "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted). But, if "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency," then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B.    Justiciability

In *Baker v. Carr*, the United States Supreme Court held that justiciability depends upon "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr*, 369 U.S. 186, 198, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *see also Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993).[4] The Federal Circuit has also held "that [a] controversy is 'justiciable' only if it is 'one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence.'" *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988) (quoting *Greene v. McElroy*, 254 F.2d 944, 953 (D.C. Cir. 1958), *rev'd on other grounds*, 360 U.S. 474 (1959)); *see also Antonellis v. United States*, 723 F.3d 1328, 1334 (Fed. Cir. 2013); *Adkins v. United States*, 68 F.3d 1317, 1322 (Fed. Cir. 1995). When a case presents a question that is constitutionally assigned to a political department—as opposed to the judiciary—that question cannot be resolved before the Court. *Compare Nixon v. United States*, 506 U.S. 224, 228-29 (1993) (quoting U.S. CONST. art. I, § 3, cl. 6) (holding that

---

[4] Although the United States Court of Federal Claims is not an Article III court, the various justiciability doctrines of Article III apply to this Court. *Emery Worldwide Airlines, Inc. v. United States*, 47 Fed. Cl. 461, 469 (2000); *see also Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); *First Hartford Corp. Pension Plan & Trust v. United States*, 54 Fed. Cl. 298, 304 n.10 (2002). Justiciability has no precise definition or scope. *Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005). But, the doctrines of standing, mootness, ripeness, and political question are within its ambit. *Id.*

courts cannot review impeachment proceedings because Article I, Section 3 of the United States Constitution gives the Senate the "'sole Power to try all impeachments'"), *with Baker*, 369 U.S. at 209, 226 (finding that Tennessee's failure to redraw legislative districts every 10 years gave rise to a justiciable question under the Fourteenth Amendment, since "the mere fact that the suit seeks protection of a political right does not mean it presents a political question").  In other words, a case that presents a question that is constitutionally assigned to a political department rather than the judiciary is nonjusticiable.

The Supreme Court has identified six factors that the Court should consider to determine whether a nonjusticiable political question is being presented, namely, whether there is:  (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker*, 369 U.S. at 217; *see also El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1361 (Fed. Cir. 2004) (quoting *Baker*, 369 U.S. at 217).

### C.     Judgment Upon The Administrative Record

Generally, RCFC 52.1 limits this Court's review of an agency's procurement decision to the administrative record.  RCFC 52.1; *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence.").  And so, unlike a summary judgment motion brought pursuant to RCFC 56, "the existence of genuine issues of material fact does not preclude judgment upon the administrative record" under RCFC 52.1.  *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011) (citations omitted); RCFC 56.  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

### D.      Supplementing The Administrative Record

The Federal Circuit held in *Axiom Resource Management* that the "parties' ability to supplement the administrative record is limited," and that the administrative record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom*, 564 F.3d at 1379-81; *see also Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 93 (2013). The Supreme Court has also held in *Camp v. Pitts* that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). This focus is maintained in order to prevent courts from using new evidence to "convert the arbitrary and capricious standard into effectively de novo review." *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 671 (2009) (citations omitted).

This Court has interpreted the Federal Circuit's directive in *Axiom* to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps, but is not permitted when the documents proffered are unnecessary for an effective review of the government's procurement decision. *Id.* at 672. And so, this Court has precluded supplementation of the administrative record with declarations that contain "post-hoc contentions of fact and argument." *Id.*

### E.      Injunctive Relief

Lastly, under its bid protest jurisdiction, the Court "may award any relief [it] considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). In deciding whether to issue a permanent injunction, the Court considers:

> (1) whether . . . the plaintiff has succeeded upon the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *see also Centech Grp., Inc.*, 554 F.3d at 1037. In this regard, the Federal Circuit has held that:

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (citations omitted); *but see Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a plaintiff who cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief). But, this Court has found success upon the merits to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." *Dellew Corp. v. United States*, 108 Fed. Cl. 357, 369 (2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007)); *cf. Nat'l Steel Car, Ltd.*, 357 F.3d at 1325 (addressing a motion for a preliminary injunction); *but see Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) (citations omitted) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.").

## IV.   LEGAL ANALYSIS

The parties have filed cross-motions for judgment upon the administrative record on the issue of whether the SSA's decision to exclude Iron Bow's quotation from consideration was reasonable and in accordance with the RFQ. Iron Bow argues in its motion for judgment upon the administrative record that the SSA's decision to exclude its quotation due to supply chain risk concerns was irrational, because the SSA's determination that Lexmark's owners are controlled by the Chinese government and linked to Chinese espionage are untrue and unsubstantiated. *See generall*y Pl. Mot.

The government counters that the Court should dismiss Iron Bow's complaint, because Iron Bow's challenge of the SSA's assessment of the supply chain risks associated with this procurement presents a nonjusticiable political question. Def. Mot. at 15-22. The government and NCS further argue that, even if the Court may judicially review the SSA's supply chain risk assessment, the administrative record in this matter shows that the agency's decision to exclude Iron Bow's quotation was reasonable, because the RFQ affords broad discretion to the SSA to conduct the supply chain risk assessment. *See generally id.*; Def.-Int. Mot.

For the reasons discussed below, this matter is justiciable because the national security interests implicated by the SSA's supply chain risk assessment are appropriately addressed within the context of the Court's consideration of whether to grant injunctive relief in this bid protest dispute.  In addition, a review of the administrative record makes clear that Iron Bow has not demonstrated that it is necessary to supplement the administrative record in this matter.  The administrative record also shows that the SSA conducted the SCRA in accordance with the terms of the RFQ, and that the agency reasonably concluded that the printers proposed by Iron Bow presented unacceptable risks to the government's supply chain.  And so, the Court:  **DENIES** Iron Bows motions to supplement the administrative record; **GRANTS** the government's motion to strike; **DENIES** Iron Bow's motion for judgment upon the administrative record; **GRANTS** the government's and NCS's respective cross-motions for judgment upon the administrative record; **DENIES** as moot Iron Bow's motions to admit and for leave to file a reply brief in support of its motions to supplement the administrative record; and **DISMISSES** the complaint.

### A.      This Matter Is Justiciable

As a preliminary matter, the Court is not persuaded by the government's argument that this bid protest dispute presents a nonjusticiable political question.  In its cross-motion for judgment upon the administrative record, the government argues that the SSA's assessment of the supply chain risk associated with this procurement presents a political question that is nonjusticiable, because the RFQ affords unfettered discretion to the SSA to decide whether Iron Bow's quotation presents an unacceptable supply chain risk to the government.  Def. Mot. at 15-22.  And so, the government requests that the Court dismiss Iron Bow's complaint.  *Id*.

In *Baker v. Carr*, the Supreme Court identified six factors that the Court should consider to determine whether a nonjusticiable political question is being presented, namely, whether there is:  (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also El-Shifa Pharm. Indus. Co.*, 378 F.3d at 1361 (quoting *Baker*, 369 U.S. at 217).  Specifically relevant here, the government invokes the fourth factor—"'the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government'"—as the basis for its justiciability argument here.  Def. Mot. at 21-22 (quoting *El-Shifa Pharm. Indus. Co.*, 378 F.3d at 1361).

This Court has recognized, however, that "when considering national security interests in procurement cases, the Court has typically done so in determining whether to provide injunctive relief after exercising jurisdiction and adjudicating the merits."  *EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 18 (2008).  In this bid protest dispute, the government's national security interest in preventing foreign interference with the Nation's technologies is without dispute.  Def. Mot. at 17-22; Pl. Resp. at 4.  But, this important national security interest is most appropriately addressed in this case within the context of the Court's examination of whether to afford Iron Bow any injunctive relief.  *EOD Tech.*, 82 Fed. Cl. at 18.  And so, the Court declines to dismiss the complaint upon the ground that Iron Bow's claim in nonjusticiable.

### B.    Supplementation Of The Administrative Record Is Unwarranted

Because the Court concludes that it possesses subject-matter jurisdiction to consider this bid protest dispute, the Court next examines whether it is appropriate to supplement the administrative record.  In this regard, it is well-established that the "focal point" of the Court's review of the SSA's decision to exclude Iron Bow's quotation "'should be the administrative record already in existence, not some new record made initially in the reviewing court.'"  *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1379 (quoting *Camp*, 411 U.S. at 142).  And so, the administrative record should only be supplemented in this case to correct mistakes and fill gaps "if the existing record is insufficient to permit meaningful review consistent with the APA."  *Id*. at 1379-81; *see also L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672.

Iron Bow has not demonstrated that it is necessary to supplement the administrative record in this case.  Iron Bow seeks to supplement the administrative record with any documents regarding written communications between the SSA and the United States Department of the Treasury and any documents regarding any supply chain risk assessment that the SSA conducted for other offerors in connection with the RFQ.  *See generally* Pl. 1st Mot. to Supp.  But, the government persuasively argues in its opposition to Iron Bow's motions to supplement that any

such documents are either, protected from disclosure by attorney client privilege or the work product doctrine, or do not exist.  Def. Resp. at 5-7.  Given this, the Court must deny Iron Bow's motion to supplement the administrative record with these documents.

Iron Bow also improperly seeks to supplement the administrative record with four declarations filed in support of its motion for judgment upon the administrative record.  *See generally* Pl. 2d. Mot. to Supp.  A careful review of these declarations makes clear that these documents have been created for use in this litigation and that the subject declarations were not before the SSA when the agency conducted the SCRA and the supplemental SCRA.  These declarations also do not correct mistakes or fill gaps in the existing administrative record.  *Axiom*, 564 F.3d at 1379-81.  And so, the Court must also deny Iron Bow's request to supplement the administrative record with these documents.  For these same reasons, the Court **GRANTS** the government's motion to strike these declarations and any references to the declarations in Iron Bow's filings with the Court.  *See generally* Def. Mot. to Strike.

### C. The SSA's Supply Chain Risk Assessment Was Reasonable

The administrative record before the Court shows that the SSA's supply chain risk assessment was reasonable and in accordance with the terms of the RFQ.  In its motion for judgment upon the administrative record Iron Bow raises four challenges to the SSA's supply chain risk assessment and to the supplemental SCRA.  First, Iron Bow argues that the SSA irrationally concluded that Lexmark's owners are controlled by the Chinese government or linked to Chinese espionage.  Pl. Mot. at 10-18.  Second, Iron Bow argues that the SSA irrationally determined that Lexmark's owners have access or influence over Lexmark's design and manufacturing process.  *Id*. at 18-32.  Third, Iron Bow contends that the SSA's supply chain risk assessment is internally inconsistent.  *Id*. at 32-34.  Lastly, Iron Bow contends that Lexmark's printers do not pose an unacceptable supply chain risk.  *Id*. at 34-36.  For the reasons discussed below, Iron Bow's claims are not substantiated by the administrative record.  And so, the Court **DENIES** Iron Bow's motion for judgment upon the administrative record and **GRANTS** the government's and NCS's cross-motions for judgment upon the administrative record.

1.      **Iron Bow's Claim That The SSA**
        **Irrationally Concluded That Lexmark's Owners**
        **Are Controlled By China Is Unsupported By The Evidence**

As an initial matter, Iron Bow's claim that the SSA irrationally concluded that the owners of Lexmark are controlled by the Chinese government, or linked to Chinese espionage, lacks support in the administrative record.  In this regard, the administrative record makes clear that the SSA did not find that Lexmark was controlled by the Chinese government, or linked to Chinese espionage, as Iron Bow suggests.  Rather, the administrative record shows that the agency reasonably concluded in the SCRA—and later in the supplemental SCRA—that there were connections between the foreign owners of Lexmark and the Chinese government.  AR at 12: 535-38, 23: 3691-93.  And so, the SSA properly considered these connections in conducting a supply chain risk assessment for Iron Bow's quotation.

First, the administrative record makes clear that Iron Bow's proposed subcontractor—Lexmark—is owned by Chinese companies.  In this regard, the administrative record shows that Lexmark is owned by three Chinese companies:  Apex Technologies Co. Ltd.; PAG Asia Capital; and Legend Holdings.  *Id.* at 12: 527-28, 549, 746, 23: 3691-93.  The administrative record also shows that one of Lexmark's owners—Legend Holdings—also holds an ownership interest in another owner of Lexmark—Apex Technologies Co. Ltd.  *Id.* at 23: 3692-93.  And so, there can be no genuine dispute that Lexmark is a Chinese company.

Second, the administrative record also makes clear that the SSA did not find that Lexmark's owners are controlled by the Chinese government, or linked to Chinese espionage.  To the contrary, the plain terms of the RFQ show that the SSA's supply chain risk assessment identified *potential* risks to the government's supply chain, due to, among other things, the undisputed foreign ownership of Lexmark.  *Id.* at 1: 56-57.  In this regard, the RFQ provides that the SSA may request information from Iron Bow about the degree of any foreign ownership in, or control of, Iron Bow or its proposed subcontractors.  *Id.* at 1: 56.  And so, the SSA appropriately requested and considered information about the foreign ownership of Lexmark, consistent with the terms of the RFQ.

The record evidence also shows that, after the SSA considered information about Lexmark's foreign ownership, the agency reasonably concluded that there were supply chain risks to the government due to the connections between Lexmark's owners and the Chinese

government.  For example, the SSA found in its initial SCRA that the managing partner of PAG Asia Capital is a former senior official with China's Ministry of Trade and Economic Cooperation.  *Id.* at 12: 528, 742.  Iron Bow does not dispute the SSA's finding.  Pl. Mot. at 10-13.  The SSA also found that Legend Holdings is a state-owned company that is owned in part by the Chinese Academy of Sciences.  AR at 12: 746, 23: 3983, 3692-93.  Again, Iron Bow does not dispute this fact.  Pl. Mot. at 13-17.

The administrative record also supports the SSA's finding in the supplemental SCRA of an even greater level of Chinese government ownership of Lexmark through Legend Holdings.  As discussed above, the SSA determined that Legend Holdings is also an investor in Apex Technologies Co. Ltd., the majority owner of Lexmark.  AR at 23: 3692-93.  And so, the administrative record makes clear that the SSA did not find that Lexmark was controlled by the Chinese government, or linked to Chinese espionage.  But the administrative record does show that the SSA reasonably concluded that Lexmark is a foreign-owned company and that certain connections exist between Lexmark's owners and the Chinese government.

The evidence in the administrative record also supports the SSA's finding of an unacceptable supply chain risk to the government in this case, because of the Chinese government's engagement in cyberespionage activities.  In this regard, the administrative record shows that the SSA considered congressional reports finding that the Chinese government actively engages in cyberespionage against the United States and that China has infiltrated United States computer networks.  *Id.* at 12: 536-37, 1865-66.  During oral argument, Iron Bow acknowledged that the Chinese government has been linked to cyberespionage.  Tr. of Oral Arg. at 48:9-20.  The administrative record also shows that the SSA considered a Federal Bureau of Investigation ("FBI") liaison information report warning about the potential negative impact on the United States' interests of new Chinese national security and cybersecurity laws that could enable Chinese security services to access sensitive proprietary information.  AR at 23: 3693, 4008-09.  Given the undisputed evidence in the administrative record regarding the Chinese government's engagement in cyberespionage activities against the United States and these new laws, the SSA reasonably determined that Lexmark's Chinese ownership presented unacceptable risks to the government's supply chain.  *Id.* at 12: 528, 742, 746, 1865-66, 23: 3692-93.  And so, Iron Bow's first objection to the SSA's decision to exclude its quotation lacks evidentiary support.

###### 2.     The SSA Reasonably Found That
###### Lexmark's Owners Could Influence Lexmark

Iron Bow's claim that the SSA irrationally determined that Lexmark's owners could influence Lexmark—and that the agency improperly found that such concerns have not been mitigated by Lexmark's National Security Agreement—is similarly unsupported by the record evidence.  Pl. Mot. at 24-32.  In the supplemental SCRA, the SSA determined, among other things, that the approved business relations activities permitted under Lexmark's NSA presented a risk that Lexmark's owners "may potentially have control over or influence in the components used in Lexmark's supply chain and used by Lexmark in manufacturing its printers and supplies."  AR at 23: 3687.

There is no dispute that Lexmark entered into a National Security Agreement with the United States Departments of Homeland Security and Defense pursuant to a process established by the Committee on Foreign Investment in the United States.  *Id.* at 23: 3698-724.  The record evidence also shows that the SSA considered Lexmark's NSA in conducting the supplemental supply chain risk assessment and that the agency reasonably concluded that this agreement did not mitigate the SSA's concerns about the potential influence of Lexmark's owners on Lexmark's operations.  *Id.* at 23: 3699-887; *see also* 50 U.S.C. § 4565.[5]

In this regard, a review of Lexmark's NSA shows that this agreement is not intended to address or to mitigate supply chain risks in connection with government procurements. Specifically, section 15.5 of Lexmark's NSA provides that this agreement does not limit, alter, or constitute a waiver of any other obligations imposed on Lexmark by the laws of the United States—including any obligation to address concerns about potential supply chain risks.  AR at 23: 3718.  Executive Order 13456, which governs the CFIUS process, similarly makes clear that nothing in that executive order impairs or affects the authority granted by law to the SSA to conduct a supply chain risk assessment.  Exec. Order No. 13456, 73 Fed. Reg. 4,677 (Jan. 23, 2008); *see also* Exec. Order No. 11858, 40 Fed. Reg. 20,263 (May 7, 1975).  And so, the SSA appropriately performed its own evaluation of the supply chain risks posed by Lexmark's

---

[5] The parties to the NSA are:  Apex Technology Co. Ltd.; PAG Asia Capital Lexmark Holding Limited; Shanghai Shuoda Investment Centre: Ninestar Holdings Company Limited; Foreign HoldCo, SARL; Lexmark International, Inc.; and the United States Departments of Homeland Security and Defense.  AR at 23: 3699.

printers and the agency reasonably concluded that the risk that Lexmark's owners could influence Lexmark had not been mitigated by the company's NSA.

### 3. Iron Bow's Other Challenges To The Supplemental SCRA Lack Support

Iron Bow's other challenges to the SSA's supplemental supply chain risk assessment similarly lack evidentiary support. First, Iron Bow objects to the SSA's consideration of China's new national security and cybersecurity laws in assessing whether Lexmark's NSA sufficiently prevents Lexmark's owners from gaining access to the company's proprietary information. Pl. Mot. at 35 n.27. As discussed above, the administrative record makes clear that the SSA considered these laws because the FBI issued a warning about the potential threat that these laws posed to United States interests. AR at 23: 3693. Given this, the administrative record makes clear that the SSA appropriately considered China's new national security and cyber security laws in assessing the risk to the government's supply chain.

Iron Bow's objection to the SSA's finding that certain permitted communications between Lexmark and its owners under the term of the NSA could threaten the government's supply chain is also unavailing. Pl. Mot. at 26-27. Iron Bow does not dispute that the NSA permits the communications that are of concern to the SSA. *Id.*; *see also* AR at 23: 3709-11. And so, the SSA's concern that such communications could allow the owners of Lexmark to access or influence the company's manufacturing process is reasonable, given the plain terms of the NSA and the extent of Lexmark's foreign ownership. AR at 23: 3686-87.

Iron Bow's challenge to the SSA's finding of an unacceptable supply chain risk because the owners of Lexmark can review the company's financial information under the terms of the NSA is equally unavailing. Pl. Mot. at 28-29. Again, Iron Bow does not dispute that Lexmark's financial information is regularly provided to its owners. *Id.* There can also be no dispute that the RFQ contemplates a multi-year contract that would involve the manufacture of a substantial number of new printers. AR at 1: 5. Given the nature and scope of this contract, and the terms of Lexmark's NSA, the SSA reasonably concluded that the ability to access Lexmark's sensitive financial information could, over time, permit Lexmark's owners to learn about the location of the facilities that Lexmark would use to manufacture printers and supplies for the SSA.

Lastly, Iron Bow's objections to the SSA's findings that Lexmark could transfer its software code to the company's owners—and that Lexmark's NSA raises concerns about Lexmark's VPN access, WEP WIFI usage, and facility security clearance—are also misguided. Pl. Mot. at 29-32.  In the initial SCRA, the SSA found that the large volume of printers to be manufactured under the contract at issue could require that Lexmark manufacture its printers in certain identifiable facilities, thereby, making the printers more vulnerable to manipulation.  AR at 12: 536.  Given the multi-year nature of the contract at issue and the significant number of printers to be manufactured under this contract, the SSA's concerns about the possible transfer of the software code for these printers and the level of security at Lexmark's facilities are understandable.  *Id.* at 23: 3714-15 ([***]).  In addition, Iron Bow does not explain why it would be improper for the SSA to consider Lexmark's use of VPN and WEP WIFI in evaluating supply chain risks, in light of the broad discretion afforded to the SSA in conducting the supply chain risk assessment under the terms of the RFQ.  Pl. Mot. at 30-31; *see also* AR at 1: 57; 23: 3691. And so, again, Iron Bow's claims are simply unsubstantiated by the record evidence.

### 4.   Iron Bow's Unstated Evaluation Criteria And Unequal Treatment Claims Are Misplaced

The Court is similarly unpersuaded by Iron Bow's unstated evaluation criteria and unequal treatment claims.  In its motion for judgment upon the administrative record, Iron Bow argues that the SSA imposed several new and unstated evaluation criteria in connection with the RFQ when the agency conducted the supplemental SCRA.  Specifically, Iron Bow argues that the SSA improperly required that:  (1) the SSA be a party to the NSA; (2) offerors have unlimited, direct liability to the agency for any breaches of NSA provisions; (3) Lexmark have an obligation not to transfer its software source code and hardware designs; (4) Lexmark not allow any VPN access; (5) Lexmark not use WEP WIFI; and (5) the SSA take into consideration China's new cyber laws.  Pl. Mot. at 24-26, 29-32, 35 n.27.  But, as discussed above, section E.5 of the RFQ makes clear that the SSA has broad discretion in determining the criteria that the agency will employ to evaluate supply chain risks.  AR at 1: 57.  And so, Iron Bow has not shown that the SSA's consideration of these requirements runs afoul of the terms of the RFQ.

Iron Bow also points to no evidence in the record to support its claim that the SSA engaged in unequal treatment of offerors in conducting the supply chain risk assessment.  In fact, the government states that the only supply chain risk assessment that has been performed for this

contract, to date, is the supply chain risk assessment for Iron Bow's quotation.  Def. Resp. at 5-7.
Given this, Iron Bow's unstated evaluation criteria and unequal treatment claims do not find
support in the administrative record.

### 5.    The SCRA Is Not Internally Inconsistent

While on stronger footing, Iron Bow's claim that the SSA's supply chain risk assessment
should be set aside because the assessment is internally inconsistent is also not supported by the
administrative record.  In this regard, Iron Bow argues that the SSA's supply chain risk
assessment is irrational, because the agency found that there was no increased supply chain risk
to the government in the short-term if the SSA used Lexmark's printers.  Pl. Mot. at 32-34.  The
government counters that the SSA's finding in this regard is reasonable, because this finding is
based upon the fact that the Lexmark printers currently in stock at the agency had been
purchased before the change in Lexmark's ownership.  Def. Mot. at 32-33.  And so, the
government further argues that these existing printers pose no increased risk to the government.
*Id*.

The Court does not find any evidence in the administrative record to establish that all of
the Lexmark printers currently in the SSA's inventory were purchased before the change in
Lexmark's ownership.  *See generally* AR.  But, as discussed above, the administrative record
does make clear that the multi-year contract at issue in this dispute is expected to involve the
manufacture of a substantial number of new printers.  AR at 1: 5.  Given this evidence, the
administrative record does show that the SSA reasonably concluded that the government's
supply chain risks with respect to the large volume of new Lexmark printers could increase with
the passage of time.  *Id.* at 12: 536.

### 6.    Iron Bow's Claim That Lexmark's Printers Do Not
### Pose An Unacceptable Supply Chain Risk Is Unavailing

As a final matter, the Court is also unpersuaded by Iron Bow's claim that Lexmark's
printers do not pose an unacceptable supply chain risk to the government because there have
been no reports that these printers pose a security vulnerability.  Pl. Mot. at 34-36.  As discussed
above, the contract at issue in this dispute involves the manufacture of a large volume of printers
over a period of several years.  And so, the fact that no security vulnerabilities have been
confirmed with regards to these printers, to date, does not render the SSA's supply chain risk

assessment of potential risk during the course of this contract irrational.  Given this, the Court must reject Iron Bow's final objection to the SSA's supply chain risk assessment.

### D.    Iron Bow Is Not Entitled To Injunctive Relief

Because Iron Bow has not prevailed upon the merits of any of its challenges to the SSA's supply chain risk assessment, Iron Bow has not demonstrated that it is entitled to permanent injunctive relief.  *Cf. Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction."); *Nat'l Steel Car, Ltd.*, 357 F.3d at 1324-25 (finding that a party that cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief).  In its motion for judgment upon the administrative record, Iron Bow requests that the Court permanently enjoin the SSA from awarding any contract under the RFQ until the agency conducts a new supply chain risk assessment of Iron Bow's quotation.  Pl. Mot. at 36-40.  But, as discussed above, the record evidence in this matter shows that the SSA's decision to exclude Iron Bow's quotation was reasonable and consistent with the RFQ.  And so, the Court must **DENY** Iron Bow's request for permanent injunctive relief.

### V.    CONCLUSION

In sum, Iron Bow's complaint challenging the SSA's supply chain risk assessment presents a justiciable claim that this Court may consider.  Nonetheless, Iron Bow has not demonstrated that it is necessary to supplement the administrative record in this matter, and the administrative record also shows that the SSA conducted its supply chain risk assessment in accordance with the terms of the RFQ and that the agency reasonably concluded that Iron Bow's quotation presented an unacceptable supply chain risk to the government.  Because the record evidence shows that the SSA's decision was reasonable, and in accordance with the terms of the RFQ, the Court will not set aside the SSA's sound decision.

In light of the foregoing, the Court:

1.  **DENIES** Iron Bow's motions to supplement the administrative record;

2.  **GRANTS** the government's motion to strike;

3. **DENIES** Iron Bow's motion for judgment upon the administrative record;

4. **GRANTS** the government's and NCS's respective cross-motions for judgment upon the administrative record;

5. **DENIES** as moot Iron Bow's motions to admit and for leave to file a reply brief in support of its motions to supplement the administrative record; and

6. **DISMISSES** the complaint.

It is further **ORDERED** that the clerk shall **STRIKE** the declarations filed in support of Iron Bow's motion for judgment upon the administrative record, dated January 18, 2018.

Judgment shall be entered accordingly.

Each party shall bear their own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on September 15, 2017. This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**. The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication. The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction, on or before **March 9, 2018**.

   **IT IS SO ORDERED.**


                          s/ Lydia Kay Griggsby
                          LYDIA KAY GRIGGSBY
                          Judge